# United States Court of Appeals
## For the First Circuit

No. 00-2142

UNDERWRITERS AT LLOYD'S, AND THE
COX SYNDICATE AT LLOYD'S,

Plaintiff, Appellee,

v.

CARLOS H. LABARCA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. Senior District Judge]

Before

Torruella, Circuit Judge,

Campbell and Bownes, Circuit Judges.

Carlos J. Quilichini for appellant.
José F. Sárraga with whom Jorge L. Arroyo were on brief for
appellee.

August 2, 2001

CAMPBELL, **Senior Circuit Judge**.  On June 5, 1999, the M/V GYPSY sank at her slip in San Juan Bay Marina, San Juan, Puerto Rico.  Defendant Carlos Labarca, the owner of the GYPSY, filed a claim with the vessel's insurer, plaintiff Underwriters at Lloyd's ("Underwriters").  Underwriters denied coverage under the marine insurance policy, asserting that the policy explicitly excluded coverage for two reasons:  (1) GYPSY was unseaworthy and her unseaworthy condition caused her to sink, and (2) the loss of the vessel was due to repairs, restoration or remodeling.  Underwriters then filed a declaratory judgment action with the district court for the purpose of deciding the rights of the parties under the insurance policy.  On Underwriters' motion for summary judgment, the district court held that, on the undisputed facts, the vessel was unseaworthy at the time she sank and that her unseaworthy condition was the cause of the sinking, thus relieving Underwriters of any obligation under the insurance policy.  Labarca appeals.

## I.  Factual Background

The relevant facts are undisputed.

Underwriters issued a contract of marine insurance to Labarca for his boat, GYPSY, for one hundred seventy thousand dollars.  That policy became effective on July 15, 1998 and was up for renewal on July 15, 1999.  Under the policy, Underwriters

agreed, subject to various terms and conditions, to pay Labarca for "direct physical loss or damage to the Vessel [resulting] from any external cause, including direct physical loss or damage to the Vessel caused by any hidden defect (excluding the cost of repair or replacement of the defective part) . . . ." This promise was limited by the following exclusion: "[W]e will not pay for any damage or loss of the Vessel . . . caused, in whole or in part by . . . [y]our failure to maintain the Vessel in a sound and reasonably fit condition; or loss or damage occurring during or resulting from repairs, restoration or remodeling." The policy also contained a warranty on the part of the insured owner, Labarca,

> that the Vessel shall be maintained in a seaworthy condition at all times. In the event of a loss or damage affecting the seaworthiness of the Vessel, the Vessel shall be restored to a seaworthy condition as soon as reasonably possible and the Vessel will not be operated pending completion of such repair without Our express written approval.[1]

Several days before the GYPSY sank at her slip, Labarca and a mechanic, whom he hired, removed two of the four air-

---

[1] The policy defined the term "warranty" "whereby the Insured Person undertakes to do or not to do something or to fulfill some condition . . . . If the Insured Person does not strictly comply with the terms of a Warranty, cover under this policy may not exist or cease and any loss that occurs at that time or thereafter may not be paid."

-4-

conditioning units from the vessel in order to paint the vessel's interior.  All four of the vessel's air-conditioning units were cooled with raw sea water that was pumped, via a single Oberdorfer brand Model 104M pump, through four individual hoses that ran from the ocean into each unit.  When two of the four units were removed, the two hoses that carried sea water to those two units were left unsealed at the ends that would have been attached to the units. The other two air-conditioning units remained installed on-board.

On June 4, 1999, after working aboard the GYPSY, Labarca returned home but left running the air-conditioning system aboard the vessel.  He did not know that two of the four hoses connected to the pump that supplied raw sea water to all four units were left unsealed after the previous day's work. The next morning, he was told that overnight the vessel had sunk at its slip in perfectly calm waters.

Experts for both the plaintiff and the defendant agree that the boat sank because of sea water intrusion through the two uncapped hoses, resulting from the fact that the air-conditioning system was left running when Labarca disembarked from the GYPSY on the evening of June 4, 1999.  This had caused water to be pumped through all four houses simultaneously, two

of which cooled the remaining two air-conditioning units and two of which dumped sea water into the vessel.

Also, one marine surveyor, Doug Wagner, hired to investigate the sinking of the GYPSY, found a one-inch uncapped through-hull fitting on the starboard side of the vessel approximately 2.75 inches above the load waterline. A 1998 marine survey performed on the GYPSY in order to obtain the marine insurance policy at issue did not mention this uncapped through-hull fitting.

## II. Discussion

When ruling in Underwriters' favor at summary judgment, the district court relied on its determination that the GYPSY was unseaworthy due to the two unsealed air-conditioner hoses. By this reasoning, Labarca had thus breached his warranty of seaworthiness thereby losing coverage under the policy for the damage to the vessel proximately caused by its unseaworthy condition. We review the district court's decision on summary judgment de novo, considering the record in the light most favorable to Labarca. See Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 4 (1st Cir. 2000). We affirm the district court's ruling for the reasons that follow.

A warranty of seaworthiness is an absolute duty owed by a ship owner to its crew and, in this case, to its insurer,

to provide "a vessel and appurtenances reasonably fit for their intended use."  Mitchell v. Trawler Racer Inc., 362 U.S. 539, 550 (1960); Carr v. PMS Fishing Corp., 191 F.3d 1, 3 (1st Cir. 1999); Ferrara v. A.V. Fishing Inc., 99 F.3d 449, 453 (1st Cir. 1996).  "The duty includes maintaining the ship and her equipment in . . . proper operating condition, and can be breached either by transitory or by permanent defects in the equipment."  Ferrara, 99 F.3d at 453.  Even "temporary and unforeseeable malfunction or failure of a piece of equipment under proper and expected use is sufficient to establish . . . unseaworthiness."  Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199 (1st Cir. 1980).  See also Trawler Racer, 362 U.S. at 549 ("[T]he duty [of seaworthiness] is [no] less onerous with respect to an unseaworthy condition . . . which may only be temporary").

The duty of seaworthiness applies no less to the quality of the vessel's equipment and working procedures than to the integrity of the vessel's physical structure.  For example, in Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 331 (1960), the Supreme Court held that the evidence was sufficient to create a jury question as to whether a wrench with a worn grip that slipped from a crewman's hand and damaged his foot was unfit for its intended use rendering the vessel unseaworthy.

-7-

And in Martinez v. Sea Land Servs. Inc., 763 F.2d 26, 27 (1st Cir. 1985), this court held that the vessel was unseaworthy when a crewman was injured after the plastic sleeve covering one of the boxes of soft drinks he was carrying aboard came loose, causing him to twist his back. We ruled that "the seaworthiness warranty of fitness for duty extends to material in which ships' stores [such as those destined for the crew's consumption on board] are wrapped." See also Usner v. Luckenback Overseas Corp., 400 U.S. 494, 499 (1971) ("[O]ur cases have held that the scope of unseaworthiness is by no means . . . limited [to defective conditions of a physical part of the ship itself.] A vessel's condition of unseaworthiness might arise from any number of circumstances."); Vargas v. McNamara, 608 F.2d 15, 18 (1st Cir. 1979) (holding that sufficient evidence existed from which a jury could conclude that the vessel was unseaworthy due to the unsafe procedure crewman were directed to employ for cleaning the engine room); Webb v. Dresser Indus., 536 F.2d 603 (5th Cir. 1976) (failure to provide proper foot apparel for ice and snow conditions to seaman ordered ashore to pick up supplies is an unseaworthy condition). When, as in this case, it is undisputed that the vessel's equipment, such as its air-conditioning system, was temporarily rendered unfit for its intended use, and that this unseaworthy condition was the

proximate cause of the vessel's sinking, see Ferrara, 99 F.3d at 453, coverage under the marine insurance policy is properly denied for breach of the warranty of seaworthiness.

Two further points merit comment. First, a finding of unseaworthiness is not affected by whether the owner was or was not negligent or at fault. See Trawler Racer, 362 U.S. at 548 (reaffirming that "the duty to provide a seaworthy ship depends not at all upon the negligence of the ship owner or his agents"); Ferrara, 99 F.3d at 453 (same). The fact that the air-conditioning system could have been run safely had Labarca thought to seal the disconnected hoses does not change the fact that operating the air conditioning system with the unsealed hoses created an unseaworthy condition, as the result of which the GYPSY sank. See Hubbard, 626 F.2d at 200. Second, when a vessel sinks in calm waters a presumption of unseaworthiness arises. See Pace v. Ins. Co. of North America, 838 F.2d 572, 577 (1st Cir. 1988). It is for the insured to rebut the presumption by producing competent evidence from which a factfinder could determine that the vessel sank for some reason other than the alleged unseaworthy condition. See Insurance Co. of North America v. Lanasa Shrimp Co., 726 F.2d 688, 690 (11th Cir. 1984). Labarca did not provide evidence capable of rebutting this presumption.

On appeal, as he did below, Labarca contends that the sinking of the GYPSY was caused by a latent defect, to wit, the one-inch uncapped through-hull fitting on the starboard side of the vessel. He argues that because he had no knowledge of the uncapped through-hull fitting, and because the marine survey in 1998 did not discover it, it is just the type of latent defect the policy protects against ("We will pay for . . . direct physical loss or damage to the Vessel caused by any hidden defect . . . .", see note 2 infra). Alternatively, Labarca argues that the sinking caused by the intrusion of sea water from the unsealed air-conditioner hoses is a fortuitous act of the kind covered by a typical "perils of the sea clause" in a marine insurance policy taking the accident out from under the seaworthiness warranty. See Pace, 838 F.2d at 576 ("Even supposing [the defective equipment] was unseaworthy, its contribution to the sinking would not be dispositive if the jury found another, covered cause was the predominant efficient cause of the loss.").

The district court rejected both of these arguments out of hand, as do we. For one: the undisputed proximate cause of the GYPSY's sinking was not the uncapped through-hull fitting on the starboard side but the intrusion of sea water pumped from the ocean into the vessel through the two unsealed air-

-10-

conditioner hoses. There is no evidence whatsoever that the one-inch through-hull fitting, which was above the waterline, would have caused the boat to sink on a calm night were it not for the unsealed air-conditioner hoses.[2] And two: the marine insurance policy under which Labarca insured the GYPSY has no "perils of the sea" clause on which Labarca relies in analogizing his act of turning on the vessel's air-conditioning system with sailing into a storm or a submerged object. See Ferrara, 99 F.3d at 454 (stating that "a submerged object lurking below the surface of apparently navigable waters" is a peril of the sea). Moreover, even were we to consider the "external cause" language in the "Perils Insured" paragraph[3] to include the fortuitous acts typically covered by a "perils of the sea" clause, we could not conclude that turning on a partly

---

[2] We doubt the uncapped through-hull fitting was, in any case, a latent defect, but need not decide this given the absence of evidence that the through-hull fitting was the proximate cause of the sinking.

[3] That paragraph, quoted in relevant part supra, states in full:

> **PERILS INSURED**
>
> Subject to all the terms and provision in this policy of insurance, We will pay for direct physical loss or damage to the Vessel [resulting] from any external cause, including direct physical loss or damage to the Vessel caused by any hidden defect (excluding the cost of repair or replacement of the defective part) minus any applicable deductible shown on the Declaration page.

disassembled air-conditioning system aboard a vessel is a "peril of the sea" against which marine insurance policies protect. See, e.g., R.T. Jones Lumber Co., Inc. v. Roen Steamship Co., 270 F.2d 456, 458 (2d Cir. 1959) (stating that "[p]erils of the sea are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power and which cannot be guarded against by the ordinary exertions of human skill and prudence").  The sinking of the GYPSY was likely (and not at all fortuitous) given that sea water was allowed to pour into the vessel through the disconnected air-conditioner hoses earlier left unsealed.  See, e.g., Commercial Union Ins. Co. of New York v. Daniels, 343 F. Supp. 674, 677 (S.D. Tex. 1972) (holding that a sea valve left open causing the boat to sink at its mooring was not a peril of the sea, as the latter clause "covers only fortuitous events" rather than events that although unfortunate are nonetheless "certainties").  See also 2 Thomas Schoenbaum, Admiralty and Marine Law, § 10-28 (3d ed. 2001) (citing cases that hold that negligence or fault prevents a vessel owner from coming within the definition of a peril of the sea such that "[a] collision or stranding due to negligent navigation" or "[l]ack of due diligence in providing a seaworthy vessel is fatal to establishing the defense of peril of the sea").

-12-

It is true that while the duty of seaworthiness is implied in every marine insurance policy, see The Caledonia, 157 U.S. 124, 132 (1895), it is not an indefinite warranty and does not apply at all times. See, e.g., West v. United States, 361 U.S. 118, 122 (1959) (determining that "it would be an unfair contradiction to say that the owner held the vessel out as seaworthy" where vessel was turned over to ship repair contractor for complete overhaul for sole purpose of making her seaworthy); Roper v. United States, 368 U.S. 20, 21-22 (1961) (where vessel is not "in navigation" -- i.e., no longer used to travel the seas -- it carries no warranty of seaworthiness). Labarca's marine insurance policy implied as much in the seaworthiness clause by eliciting the additional promise from the insured that "[i]n the event of a loss or damage affecting the seaworthiness of the Vessel, the Vessel shall be restored to a seaworthy condition as soon as reasonably possible and the Vessel will not be operated pending completion of such repair without Our express written approval." Here, however, the risk to the vessel caused by removal of the two air-conditioners was readily capable of being resolved at all times by the simple expedient of capping the hoses or else refraining from operating the air-conditioning system until the two units that were removed had been reconnected. In such circumstances, given the

ease with which the equipment could safely be temporarily removed, we think Labarca's warranty of seaworthiness remained in effect throughout the occurrence of the events that proximately caused the sinking of the GYPSY.[4]

In sum,

> [w]hat has been said is not to suggest that [Labarca] is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.

Trawler Racer, 362 U.S. at 550. Although the air-conditioning system aboard the GYPSY need not, therefore, have been perfect, it was obviously left so as to be both unfit for its intended use and highly dangerous to the vessel's continued viability.

The judgment below is **<u>affirmed</u>**. Costs to appellee.

---

[4] Concluding, as we do, that the district court was correct in holding that Underwriters had no obligation to Labarca on the ground that the GYPSY was unseaworthy, we do not reach the merits of Underwriters' second stated explanation for declining coverage under the policy, that being the policy's exclusion for "loss or damage occurring during or resulting from repairs, restoration or remodeling."

-14-