**RELIANCE NATIONAL INSURANCE COMPANY (EUROPE) LTD.**

v.

**Alain J. HANOVER and Daniel A. Hanover**

**No. CIV.A. 00–11202RGS.**

United States District Court, D. Massachusetts.

March 3, 2003.

Steven E. Goldman, Goldman & Hellman, P.A., Fort Lauderdale, FL, Cheryl Enright, Morrison, Mahoney, & Miller LLP, Boston, MA, for Reliance National Insurance Co., Plaintiff.

Robert S. Wolfe, Wolfe Associates, Gloucester, MA, for Alain J. Hanover, Daniel A. Hanover, Defendants.

## FINDINGS OF FACT, RULINGS OF LAW AND JUDGMENT AFTER A TRIAL WITHOUT JURY

STEARNS, District Judge.

On February 23, 2000, the STIARNA, a 12 meter sailboat owned by defendants Alain Hanover and Daniel Hanover, caught fire and sank while attempting a seventy mile passage between the Caribbean islands of Trinidad and Grenada. After rejecting the Hanovers' claim for the loss of the recently purchased boat, plaintiff Reliance National Insurance Company (Europe) Ltd. (Reliance)[1] brought this declaratory action seeking the court's approval of its decision to revoke the Hanovers' insurance coverage. The Hanovers counterclaimed, alleging breach of contract, promissory estoppel, and "bad faith."

On July 22, 2002, the court denied the parties' cross-motions for summary judgment, ruling that issues of fact precluded any resolution of the case as a matter of law. On February 3, 2003, a trial commenced with the court sitting in admiralty.[2]

## STIPULATIONS AND FINDINGS OF FACTS[3]

1. *The plaintiff Reliance National Insurance Company (Europe) Ltd., is a cor-*

---

1. Reliance ceased its marine underwriting business in February of 2000, after its parent, Reliance National Insurance Company, was declared insolvent by the Insurance Department of the Commonwealth of Pennsylvania. Reliance (Europe), although inactive, is solvent.

2. The court had earlier struck defendants' claim to a jury trial, a decision reaffirmed in a ruling on August 14, 2002. The court reasoned that while a jury right can coexist with an admiralty claim where the parties' claims are sufficiently distinct so as to permit each to prevail without compromising the other's right to recovery, that was not the case here where the competing claims virtually mirror one another.

3. Many facts were stipulated in a commendable effort by the parties to simplify the trial. These facts are set out in *italic* type. They have been lightly edited as to matters of style, but not substance. The additional factual

poration in the business of writing policies of marine insurance, with its office and principal place of business in the City of London in the United Kingdom.

2. The defendants Alain Hanover and his son Daniel Hanover both reside in the Boston area, where the senior Mr. Hanover is a venture capitalist in a Cambridge firm called Main Street Partners.

3. Having previously chartered different types of sailing vessels, Alain Hanover "fell in love" with antique 12 meter wooden-hulled sailing yachts and wanted to purchase such a vessel. Sailing had been a consuming interest of Hanover's since his days as a member of the college sailing team at MIT. (Hanover graduated from MIT with a degree in electrical engineering). Hanover earned a rating as a sailing instructor while at MIT and was certified in 1993 for off-shore cruising. Hanover thereafter chartered boats every summer until he purchased his first "real" sailboat in 1997. He sold the sailboat in 1999 and began looking for a genuine yacht.

4. In October of 1999, the vessel STIARNA was advertised for sale on the Internet website of Authentic Yacht Brokerage ("AYB"), a firm based in Ontario, Canada. The STIARNA was a luxury sailing yacht, built in 1937 by the famed English shipwrights, Camper & Nicholson. The STIARNA was one of a series of three yachts built by Camper & Nicholson to represent England in the America's Cup.

5. Alain Hanover considered purchasing the STIARNA. He contacted an individual at AYB named Douglas Coupar. When Alain Hanover asked Coupar about the vessel's condition, he was referred to the material on the website. He was also invited to inspect the STIARNA in Trinidad.

6. Alain Hanover downloaded from the AYB website a number of pages in which the condition and history of the STIARNA were described. According to the posted material, the STIARNA had been portrayed in glowing terms by a succession of surveyors. "Th[e] Stiarna is truly one of a kind and will appeal to the discriminating yachtsman who will appreciate her worth as a clasic (sic)." (1990). "Her beauty of line is matched by her aristocratic interior and impeccable standards." (1992). "The vessel ... has been skillfully converted to a cruising yacht, and has been carefully maintained in very good condition." (1997). The listing concluded that the STIARNA's "present maintenance is about 85 percent of excellent," with repairs expected at the next haulout to her generator, underdeck finish, and iron supports. The value of the STIARNA over the ten years of the reported surveys was said to have fluctuated "from a low of $200,000 to a high of $500,000, with a replacement cost consistently estimated at $1,500,000." The asking price for the STIARNA was $250,000.

7. Coupar faxed the Hanovers a document entitled "Condition Status at Haulout July 1, 1999." This survey was conducted on July 1, 1999, at a yard in Chaguaramas, Trinidad. The survey rated most of the STIARNA's components and systems as either very good or excellent, including the mast and boom, the engine and transmission, the brightwork, the sails, the electrical system, and the bottom. The frame was reported as average, with 30% of the steel in need of reinforcement or replacement. According to the survey, the engine needed valve sleeves "to eliminate smoke." While the identity of the 1999 surveyor was not conclusively established at trial, it was most likely Fred Thomas, the owner of the

findings made by the court are set out in standard type.

yard in Trinidad where the haulout had taken place. Thomas had been hired as the caretaker for the STIARNA by its absentee owner, Donald Steinmeyer.

8. *Coupar arranged for the Hanovers to travel to Trinidad to view the STIARNA.*

9. *Between January 15 and 18, 2000, the Hanovers inspected the STIARNA in Trinidad and took it for sea trials under both sail and power. They did not observe any problems with the mast. They also met with Thomas and developed a plan for a two stage restoration of the vessel. The first stage involved, in part, the gutting of the interior quarters and the replacement of the frames and power train. The STIARNA would then be sailed for a season and returned for a full build out of the interior.* During the inspection tour, Alain Hanover was told by Thomas that Steinmeyer had neglected the STIARNA. Hanover observed considerable wear on the yacht's wood and metal surfaces and the poor condition of her brightwork. The interior fittings were frayed and out of date. Parts of the hull appeared to have been infected by rot. Hanover thought that the representation that the STIARNA had been excellently maintained was an exaggeration. During the test sail, Alain Hanover observed a number of problems with the STIARNA's engine. After Steinmeyer warmed up the engine, he could not shut it down with the kill switch. When Steinmeyer resorted to a manual shutting off of the fuel line, Hanover noticed that he bent the throttle arm, making it impossible to start the engine with the hatch in a down position. Hanover also observed an oily film emanating from the bilge and white smoke spewing from the exhaust. Finally, Hanover saw that a leak in the exhaust manifold had been patched with what Hanover described as "glass" (probably a fiberglass compound). Hanover did not feel that the engine was in an acceptable condition. Any reservations that Hanover felt about the purchase evaporated, however, when the STIARNA was put under sail. In Hanover's estimation, the yacht sailed "beautifully." The refit plan developed by Hanover and Thomas was to proceed in two stages. The initial "patch" job, which was expected to cost around $150,000, called for the replacement of the engine, the mast, the sails, the ironwork, the refinishing of the hull and deck, and the gutting of the "rustic" interior. During the second stage of the refit, which was expected to cost as much as $450,000, the STIARNA was to be taken out of the water for a complete interior and exterior refurbishing. Hanover's approach, inspired by his "passion for classic yachts," was to "spare no expense" in restoring the STIARNA to her pristine glory. Hanover wanted "a showcase boat that I and my family will enjoy all our lives."

10. *Thereafter, the Hanovers negotiated a price reduction and agreed to purchase the STIARNA for $130,000 subject to obtaining insurance.* Steinmeyer, the STIARNA's owner, set an initial asking price of $150,000. After Alain Hanover told Steinmeyer of the problems he had observed, Steinmeyer reduced the price to $130,000.

11. *At Coupar's suggestion, Alain Hanover contacted Cedric Miller, a marine insurance broker at UFANS Insurance Services in Ontario, Canada, to obtain a quote for a policy of marine insurance to cover the STIARNA.*

12. *On January 19, 2000, Alain Hanover sent AYB a check in the amount of $13,910 as a deposit. He forwarded an additional $116,090 to be held in escrow pending receipt of documentation and insurance.*

13. *On January 25, 2000, Coupar filled out a Vessel Owners Insurance Applica-*

tion that was signed by Alain Hanover and sent to UFANS. The application was faxed to Hanover by Coupar. Hanover paid little attention to the application and returned it by fax to Coupar nineteen minutes after its receipt, adding only his signature and Social Security number.

14. *On January 27, 2000, Miller forwarded to T L Dallas ("TLD"), a British insurance broker, a faxed letter together with copies of the "Condition Status at Haulout July 1, 1999" and the material posted on the AYB web site. Miller's cover letter stated, in part, that the Hanovers were to take the vessel to Grenada from Trinidad "for some work to be done." The purchase price was listed as $130,000.[4] It was projected that the work would take sixty days to complete and that the vessel would have an increased value thereafter. UFANS did not forward estimates for the refit work to be performed. Miller suggested that since the trip between Grenada and Trinidad was only 100 miles or so, a survey should be performed after the work was done in Grenada.* Miller's letter to TLD touted the deal as "one to get your teeth into." Stuart Riches, the TLD underwriter to whom the fax was addressed, had reservations about the risks involved in insuring a sixty-four year old wooden yacht. Consequently, the insurance application was referred to Beric Usher, a senior TLD underwriter. Based on the materials provided by UFANS, which consisted of the insurance application, the AYB website documents, and the 1999 haulout survey, Usher was persuaded that the STIARNA was in a seaworthy condition. Usher relied particularly on the website statement that the STIARNA's condition was "85 percent of excellent." Although Usher understood from Miller's letter that

the STIARNA was to undergo two refits, he did not request additional information from UFANS regarding the STIARNA's condition. He did, however, note that the insurance application had been incompletely filled out, and he conditioned the placement of permanent coverage on the submission of a completed application.

15. *UFANS was among the many marine insurance brokers in North America that would approach TLD seeking quotes on behalf of clients such as the Hanovers.*

16. *Marine insurance brokers would submit application materials containing information material to the underwriter's assessment of the particular risk. Based upon the information disclosed in the application materials, the underwriter at TLD, acting on behalf of Reliance, would make the determination as to whether he wished to issue a quote, the terms for coverage, and other essential details.*

17. *UFANS was absolutely free to approach any one of the other facilities in the markets in which marine insurance policies were being offered in January 2000.*

18. *Alain Hanover received copies via fax from UFANS of the enclosure letter and application submitted to TLD in order to elicit a quote and a decision to issue a policy of marine insurance. He was also aware that the web site pages from AYB describing the STIARNA and the document entitled "Condition Status at Haulout July 1, 1999" were provided with the application.*

19. *Usher agreed to Miller's suggestion that TLD not require the customary full*

---

**4.** There is a dispute about this figure. To the court's eye, the first application (which was not filled out by Alain Hanover) indicates that the STIARNA's purchase price was to be

$130,000. There is no dispute but that the second application, filled out by Hanover on February 14, 2000, listed the purchase price as $150,000.

survey of the vessel in Trinidad before its departure for Grenada.

20. *On January 31, 2000, TLD issued a quotation to UFANS. Later that same day, UFANS sent a fax to Alain Hanover outlining the coverage that was being offered through TLD.* A premium of $2,750 was quoted, excluding liability for any paid crew. Coverage was conditioned on a new out of water survey to be conducted after the refit in Grenada and before the planned voyage to Boston.

21. *On February 1, 2000, a Bill of Sale was executed by Steinmeyer in favor of the Hanovers as joint owners of the STIARNA.* Alain Hanover immediately contacted Thomas asking him to prepare the STIARNA for the trip to Grenada and offering to pay the expenses for any necessary pre-voyage repairs. Hanover told Thomas that the sail to Grenada would be "great fun." "With her full sails, she really takes off."

22. *On February 2, 2000, UFANS sent a fax to Alain Hanover confirming execution of his instructions to bind the coverage offered through TLD.* An increase in the liability limit raised the premium to $2,950. The fax also quoted an additional premium for crew coverage of $1,300.

23. *On February 3, 2000, TLD issued an amended quotation to UFANS, reflecting increased limits for crew coverage.* The adjusted premium came to $4,250. The quotation repeated the requirement that a new out of water survey be conducted after the refit in Grenada.

24. *On February 3, 2000, in response to the quotation, UFANS sent a confirmatory fax to TLD.* The fax confirmed the Hanovers' acceptance of the additional premium for the increased liability limit

and requested a binding of coverage. The fax stated that the STIARNA would leave Trinidad for Grenada on February 20, 2000, where the refit would begin.[5]

25. *Later on February 3, 2000, UFANS sent a second fax to TLD confirming the Hanovers' acceptance of the increased policy limits for coverage of the vessel's crew "after refit."*

26. *On February 4, 2000, TLD responded to UFANS with a written confirmation that coverage had been bound for what would be policy no. 200/533/26861, attaching a two page Temporary Cover Note.* Thereafter, the insurance premium was paid. The confirmation noted that Hanover's insurance application form was incomplete and that he was required to submit a completed application. The provisional policy was issued "subject to the terms and conditions in the policy wording and endorsements attached." That same day, Miller sent a memorandum to Hanover confirming the policy and enclosing a UFANS covernote, invoice, a second application, and "a copy of the policy wording that will be on the formal policy when we receive it from our correspondants (sic) in England."

27. *The pertinent policy wording was as follows:*

9. *General Conditions & Warranties*

\* \* \* \* \* \*

(b). *It is warranted that the scheduled vessel is seaworthy at the inception of the insuring agreement. Violation of this warranty will void this insuring agreement from its inception.*

(c). *This insuring agreement does not cover any loss or damage caused by*

---

**5.** The departure date was later extended to February 23, 2000, because of unusually rough seas.

*your failure to exercise due diligence properly to manage the scheduled vessel or maintain it in a seaworthy condition.*

*(d). This insuring agreement incorporates in full your application for insurance and it constitutes the entire contract between us. At your request, various provisions of this insuring agreement may be varied only by our prior written agreement.*

\*     \*     \*     \*     \*     \*

*(m). This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance. No action or inaction by us shall be deemed a waiver of this provision.*

28. *On February 9, 2000, with insurance in place, the STIARNA was documented in the name of the Hanovers.*

29. *On February 12, 2000, Alain Hanover received photographs of the STIARNA attached to an e-mail from Thomas. One of these photographs depicted a rotted area in the mast. Alain Hanover made no disclosure of the existence of this condition to Reliance. He did, however, arrange to have the mast replaced by Thomas during the initial refit.* While Alain Hanover had entertained the idea of having the second stage of the refit done by a Newport, Rhode Island shipyard, his intention was always to have Thomas do the initial refit in Grenada. The discovery of rot in the mast persuaded Thomas that the idea of sailing to Grenada was unwise. In his February 12, 2000 report to Hanover, Thomas related "that our findings of [three rotted spots and two opened scarfs in the mast] indicate that we may have to motor up to Grenada gently with just small sails to steady us.... I know you were looking forward to a nice sail up but I don't think we should push her at all."

30. *Alain Hanover completed and signed a second insurance application on February 14, 2000, and mailed it to UFANS that same day. TLD received the second application on February 28, 2000.* The second application, while providing additional insurance detail, did not mention either the rot in the mast or Hanover's concerns about the STIARNA's engine.

31. *The second application submitted by Alain Hanover stated that the purchase price of the STIARNA was $150,000.*

32. *The Hanovers made arrangements to move the vessel from Trinidad to Grenada in the later part of February. The arrangements included hiring Eric Wiberg, a professional captain to command the voyage, hiring a vessel (the Calypso II") to accompany the STIARNA during the transit, and hiring a crew to assist.* Wiberg was hired by Alain Hanover on February 8, 2000, to serve as the STIARNA's captain on her voyage to Grenada and eventually to Boston. Despite his relative youth, Wiberg was an experienced captain, having commanded a chartered oceangoing yacht before serving for three years as the operations officer for a Singapore-based tanker fleet. He then founded his own yacht delivery business. Wiberg was asked by Hanover to inspect the STIARNA before the departure to Grenada. Wiberg arrived in Trinidad on February 16, 2000, to begin the inspection. After speaking with Thomas, he confirmed the observations of rot in the mast, which he believed had been caused by the puddling of water in the scarfing. While the rot did not appear to have penetrated the mast to any significant depth, Wiberg agreed with Thomas that the mast was not fit to carry a full load of sails. Wiberg considered removing the mast, but feared that the balance of the boat would be upset. While cleaning the bilges, Wiberg

noticed an oil slick, although he did not consider that unusual in a boat as old as the STIARNA. Because the original plan to sail to Grenada had now been ruled out, the 43 year old Perkins engine, which was being repaired by one of Thomas's workmen, became the main focus of Wiberg's attention. Wiberg concluded that the installation of a new Yanmar engine would delay the transit to Grenada by at least a month. Nonetheless, Wiberg was concerned that the Perkins engine might not be able to complete the fourteen hour trip. For that reason, he concurred in Thomas's suggestion that the Calypso II be chartered as an escort and standby tow vessel. Beginning on February 18, 2000, Wiberg started the Perkins engine every few hours without incident. After the Hanovers arrived in Trinidad on February 21, 2000, Wiberg took the STIARNA on a one and one-half hour sea trial. In Wiberg's judgment, the engine performed satisfactorily, although it continued to emit a steady stream of white smoke. Wiberg's overall impression was that the STIARNA was a "tired" vessel.

33. *The rot in the mast was not repaired prior to the STIARNA's departure from Trinidad. The Hanovers decided to set out from Trinidad, bound for Grenada seventy miles away, relying on the STIARNA's engine and a tow from the accompanying Calypso II in the event the STIARNA's engine failed.*

34. *Alain Hanover was "concerned about the engine." A new engine was not installed before the vessel's departure from St. Thomas to Grenada.* Hanover's concern about the engine dated from his observations during the demonstration sail with Steinmeyer in January. Replacing the Perkins engine with a new 140 horsepower Yanmar engine was the number one item on Thomas's "patch" list. Hanover initially believed that Thomas would install the Yanmar engine prior to the embarkation to Grenada, but Wiberg told him on February 8, 2000, that because the engine was buried deep in the bilge, there "was too little time" to replace the engine prior to the passage. In hiring Wiberg, Hanover gave instructions that he "make [sure] the engine is in good working condition." When Wiberg reported on February 20, 2000, that the main engine had successfully started, Hanover misinterpreted Wiberg's message as a warranty that the engine was in good working order. Although Hanover thought that the Perkins engine "acted well and reliably" during the test run, he "easily agreed" with the recommendation that the Calypso II be hired as an escort "in case we needed a tow." As Hanover later explained to Reliance's investigator, "[t]he engine had trouble turning over every time it was started," causing him concern that the engine might seize during the passage.

35. *Before departing for Grenada on the morning of February 23, 2000, the Hanovers had authorized Thomas to complete work on the electrical system, gear, bilge, tackle, engine, mast and pumps and to install certain equipment on the STIARNA at a cost of $7,120.78. The Hanovers had also reimbursed Wiberg for the costs of provisions, tools, and replacement parts.*

36. *On or about February 23, 2000, at approximately 6:50 a.m., less than one hour after departing from a dock in Chaguaramas, Trinidad, the STIARNA caught fire, burned and sank. The cause of the fire is unknown.* The fire originated deep in the engine hole some 15 feet from the patch on the manifold (which Wiberg was monitoring because of the smoke from the exhaust). When heavy smoke erupted from the engine hole, Wiberg observed a sudden drop in oil pressure and shut down the engine. Flames then broke out. De-

spite attempts by the crew to fight the fire, the flames refused to dampen. When the fire spread to the cabin, Wiberg gave the order to abandon ship. The Hanovers and the crew leapt into the water and swam to the Calypso II. From the deck of the Calypso II, the Hanovers watched the STIARNA burn and eventually sink to the bottom.

37. *The STIARNA was insured under Reliance marine insurance policy No. 200/533/26861, which provided hull & machinery coverage in the amount of $150,-000.*

38. *The Hanovers filed a claim with Reliance for the loss, including the hull, appurtenances, furniture, apparel, personal property, and the personal property of the workmen and crew.* TLD hired Douglas Wager, an accredited marine surveyor, to investigate the loss. Wager's specific instruction from TLD was to determine whether "based on the uncontested facts (as disclosed by this assured)" the STIARNA was seaworthy. In a Preliminary Report submitted to TLD on April 4, 2000, Wager offered the following conclusions: (1) the accident was wholly fortuitous and not attributable to any fault on the part of the Hanovers; (2) any doubts about the seaworthiness of the STIARNA depended on Alain Hanover's own statements, and given his "inexperienced nature," might not be deemed credible; (3) that the one verified unseaworthy condition, the rot in the mast, was not the proximate cause of the sinking; (4) that the plans to refit the STIARNA had been fully disclosed to the broker (Miller) and "presumably" TLD; and (5) that the "discovery of dry-rot in the mast was made by the delivery captain and was not known prior to the attachment of the insurance policy." (Wager's conclusions (4) and (5) were factually in error). The Preliminary Report provoked an acerbic response from Mark Thomas, a TLD adjuster, who suggested that Wager put aside his opinions about the intentions and character of the Hanovers, and explain how he had come to the view that "a sailing vessel is seaworthy notwithstanding [its] inability to navigate safely under sail." On April 26, 2000, Wager wrote to TLD agreeing that the condition of the mast rendered the STIARNA unseaworthy.

39. *The Reliance policy was received by the Hanovers on March 1, 2000.* On July 3, 2000, TLD issued an endorsement cancelling the policy from its inception.

40. *On July 17, 2000, counsel for Reliance gave the Hanovers notice of the decision to rescind the policy and forwarded a check refunding the premium. The Hanovers never presented the check for payment.*

### SUMMATION

There is no question but the loss of the STIARNA was an accident. In the brief month that Alain Hanover had owned the STIARNA, he had fallen in love with the boat and would have done nothing intentionally to harm her. Having recognized the STIARNA's potential as a true "showcase boat," his goal was one of immediate gratification—to restore the STIARNA to her original glory as quickly as possible. Thomas saw the project as an emblem and opportunity for his newly relocated shipyard and, as a result, was eager to move the STIARNA immediately to Grenada to begin the refit. Wiberg, who recognized the seriousness of the STIARNA's shortcomings, was nonetheless hesitant to disappoint a prospective long-time employer. Each of the actors, despite his better instincts, had a personal motive for putting caution aside. This perfect storm of bad judgment precipitated the sinking of the STIARNA.

*PRINCIPLES OF LAW*

██ In interpreting a policy of insurance, a court employs the usual rules that apply to the interpretation of a contract, construing the policy "according to the fair and reasonable meaning of its words." *U.S. Aviation Underwriters, Inc. v. Fitchburg–Leominster, Flying Club, Inc.,* 42 F.3d 84, 86 (1st Cir.1994). The insured bears the burden of establishing coverage under the policy. *St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1200 (1st Cir.1994).

Five provisions in the General Conditions and Warranties section of the policy issued to Hanover are of particular relevance: (1) under section 9(b), the insured warrants that the scheduled vessel is seaworthy at the inception of the policy; (2) section 9(b) further voids the policy from its inception should the warranty of seaworthiness be breached; (3) section 9(c) excludes any loss caused by the insured's failure to maintain the vessel in a seaworthy condition; (3) section 9(d) incorporates the insurance application and its express duty of full disclosure into the policy; and (4) section 9(m) declares the policy null and void in the event of any material nondisclosure or misrepresentation by the insured.[6]

██ The intent of these provisions is to capture the full limits of the admiralty doctrine of *uberrimae fidei* (utmost good faith). This widely accepted doctrine "requires 'that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk.'" *Transamerica Leasing, Inc. v. Institute of London Underwriters,* 267 F.3d 1303, 1308 (11th Cir.2001), quoting *HIH Marine Servs., Inc. v. Fraser,* 211 F.3d 1359, 1362 (11th Cir.2000). "The duty to disclose extends to those material facts not directly inquired into by the insurer." *Id.,* 211 F.3d at 1362. Unlike the case with ordinary contracts of insurance, an insured party in a maritime contract is held strictly to the warranties of the policy.

In all areas of insurance other than maritime insurance, an insured's breach of warranty does not "avoid an insurance contract or defeat recovery thereunder unless such breach materially increases the risk of loss, damage, or injury within the coverage of the contract." *Id.* § 3106(b). In other words, if an insured breaches a warranty that is collateral to the risk that is the primary concern of the contract, the insured will not be precluded from recovery. This is generally not the rule in maritime insurance contracts. Under the federal rule and the law of most states, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover. *See Buglass* at 27–28, 34; Patrick J.S. Griggs, *Coverage, Warranties, Concealment, Disclosures, Exclusions, Misrepresentations, and Bad Faith,* 66 Tul. L.Rev. 423, 431–32 (1991). The rule of strict compliance with warranties in marine insurance contracts stems from the recognition that it is peculiarly difficult for marine insurers to assess their risk, such that insurers must rely on the representations and warranties made by insureds regarding their vessels' condition and usage. *See O'Connor Transp. Co. v. Glens Falls Ins. Co.,* 198 A.D. 136, 189 N.Y.S. 612, 614 (4th Dep't 1921), *aff'd,* 233 N.Y. 659, 135 N.E. 959 (1922); *see also In re*

---

**6.** I understand the Hanovers to argue principally that they never received notice, actual or constructive, of the wording of the policy. This argument is contradicted by the UFANS memorandum sent to Alain Hanover on February 4, 2000, referencing the enclosed "copy of the policy wording."

*Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 80–81 (2d Cir.1996) (discussing maritime doctrine of *uberrimae fidei*, or utmost good faith, which requires party seeking insurance to disclose all circumstances known to it which materially affect the risk); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986) (same).

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 190 F.3d 26, 31–32 (2d Cir.1999). The doctrine, however strict, does not require disclosure of peripheral, non-risk matters. *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 55 (1st Cir.1995) ("Whatever the exact extent of the applicability of the strict *uberrimae fidei* standard, we cannot believe that in these times it requires a pleasure boat owner to notify the insurer every time the craft takes on a small amount of water, or has engine trouble, at pain of losing coverage."). Rather, the standard for disclosure "is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material. To be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk. The assured's failure to meet this standard entitles the underwriter to void the policy *ab initio*." *Knight*, 804 F.2d at 13 (citations omitted) (no reasonable juror could find that an insurer providing virtually identical coverage would not want to know of the cancellation of the insured's prior policy).[7]

■ Once coverage has commenced, the doctrine of *uberrimae fidei* imposes a continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, knowingly be permitted to break ground in an unseaworthy condition. *Windsor Mount Joy*, 57 F.3d at 54–55. In order for a vessel to be seaworthy, it "must be reasonably fit for its intended use." *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 3 (1st Cir.1999), citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The warranty of seaworthiness is an absolute and non-delegable duty owed by a ship owner to the insurer and encompasses the integrity of the vessel's physical structure as well as its equipment and working procedures. *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 7 (1st Cir.2001). Moreover, a finding of unseaworthiness is not dependent upon an owner's negligence or fault. *Id.* at 8. *See also Trawler Racer*, 362 U.S. at 548, 80 S.Ct. 926.[8]

## ULTIMATE RULINGS OF FACT AND LAW

■ (1) The STIARNA was not seaworthy at the inception of the policy. Nor was

---

7. The Hanovers argue that their duty to disclose expired on February 4, 2000, when Reliance committed itself to the insurance contract. *See Rallod Transportation Co. v. Continental Ins. Co.*, 727 F.2d 851, 854 (9th Cir.1984). Even if that were true, the argument ignores the fact that the policy was conditioned on the submission of a completed application, which Alain Hanover did on February 14, 2000. By that time, putting aside his earlier (and undisclosed) concerns about the STIARNA's engine and the possibility of rot in her hull, Hanover had received Thomas's report and photographs alerting him to the defective mast.

8. The Hanovers argue broadly that no warranty of seaworthiness attaches to a ship undergoing repairs, citing *West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). *West* is simply not in point, as the case deals not with an insurance warranty, but with a vessel owner's liability for a breach of the general seaworthiness warranty when a vessel has been taken out of service and placed under the control of an independent contractor for the purpose of restoring her to a seaworthy condition. The second case cited by the Hanovers, *Labarca, supra*, is a marine insurance case holding a vessel owner liable for a breach of the seaworthiness warranty where his own negligent repairs caused the vessel to sink.

she seaworthy at the time she embarked for Grenada. A yacht that cannot safely raise its sails or rely on its engine is by definition unfit for its intended purpose.

(2) The policy issued by Reliance on February 4, 2000, was conditioned on Alain Hanover's submission of a second completed insurance application.

(3) The defects in the STIARNA's mast were known to Alain Hanover prior to February 14, 2000, the date on which the second insurance application was submitted, while Hanover knew or should have known that the STIARNA's engine was unfit for service prior to his submission of the first insurance application on January 25, 2000.

(4) Hanover did not at any time disclose these defects to Reliance.

(5) Hanover's failure to disclose the defects in the STIARNA's mast and engine and his failure to see the yacht restored to a seaworthy condition before breaking ground on February 23, 2000, were material breaches of the seaworthiness warranties of the policy.

(6) These defects caused the loss of the STIARNA.[9]

(7) Reliance would not have issued the policy had the STIARNA's defects been fully disclosed.

(8) The policy as ultimately issued was void and voidable.

(9) Because the policy was voided, there can be no recovery by the Hanovers for the STIARNA's loss.[10]

---

**9.** The Hanovers, echoing Wager's preliminary opinion, argue that the defect in the mast was not the proximate cause of the loss. *See Labarca*, 260 F.3d at 7. I do not agree. While the aging engine was the immediate cause of the destructive fire, had the STIARNA been able to make the passage under sail as was originally intended, it would not have been

*ORDER*

For the foregoing reasons, judgment shall enter for the plaintiff Reliance National Insurance Co. (Europe) Ltd. Reliance shall within ten (10) days of the date of this Order submit a proposed final form of judgment.

SO ORDERED.

necessary to place the stress on the engine that in all likelihood caused it to fail.

**10.** At the conclusion of the trial, the parties were invited to submit proposed findings of fact and rulings of law on or before February 26, 2003. Both sides did so. I commend the parties for their faithfulness to the record in laying out the suggested findings of fact.