NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0446n.06

Nos. 18-5053/5055/6274

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ROBERT GULLEY, | ) | **FILED** |
|     Plaintiff-Appellant, | ) | Aug 22, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| OPERATION BASS, | ) | |
|     Defendant-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| FLW, LLC, | ) | COURT FOR THE WESTERN |
|     Defendant, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| HARTFORD INSURANCE COMPANY, | ) | |
|     Intervenor-Appellee. | ) | |

Before: MOORE, KETHLEDGE, and MURPHY, Circuit Judges.

KETHLEDGE, Circuit Judge. Robert Gulley has already recovered over $300,000 from the person responsible for a boating accident that injured him. Now he seeks to recover as well from his employer and his employer's insurance company. The district court rejected his arguments. We affirm.

I.

The Ranger Z520 is a high-performance fishing boat. At 20'9" in length, the 2011 model measures slightly longer than your average pickup truck. The boat's cockpit holds two cushioned seats, one for the driver and one for the passenger. An aisle separates those seats, creating a path from the cockpit to the front and rear of the boat, where the Ranger's two fishing platforms are located. These front and rear platforms each have a "pedestal seat"—a small chair atop a metal

rod that rests in a socket at the center of the platform.

From the driver's seat, a fisherman controls the Ranger's direction and speed. For direction, the boat sports a standard steering wheel. For speed, the Ranger has a hand throttle mounted to the driver's right. To accelerate, the driver pushes the throttle toward the front of the boat; to put the engine in reverse, the driver pulls the throttle toward the back of the boat. A fisherman maneuvering the Ranger therefore resembles someone driving a manual-transmission car—left hand on the wheel, right hand on the stick.

The Ranger's manufacturer, Fishing Holdings, LLC, sells and leases boats to customers nationwide. One of its longtime customers is Operation Bass, Inc., a company that organizes professional bass fishing tournaments throughout the United States. In 2011, Operation Bass held a tournament on Kentucky Lake, a narrow lake that extends from southern Kentucky into northern Tennessee. The tournament hosted several professional fishermen, including Shinichi Fukae. As part of the tournament rules, Operation Bass required each fisherman to ride with a cameraman who recorded the event for broadcasting. Fukae's cameraman was Robert Gulley.

On the final morning of the tournament, the two men shoved off in the 2011 Ranger Z520. That afternoon, Fukae decided to move north to fish one final location before the competition ended. As Fukae prepared to maneuver the boat, he removed the pedestal seat from the forward fishing platform and laid it in the aisle between the driver and passenger seats. Fukae then put the boat's engine in gear and motored north. As the boat accelerated, the pedestal seat began to move around in the aisle. The seat's movement distracted Fukae, and he tried to secure the seat with his foot. When Fukae next looked up, he saw that the boat was heading directly toward a bridge tower; but it was too late. The Ranger crashed into the bridge at speed. Gulley suffered numerous injuries, including nine fractured ribs and a head wound.

Gulley thereafter sought compensation for his injuries from several sources. First, he filed a workers' compensation claim with Operation Bass. As a result, Operation Bass's insurer, Hartford Insurance Company, covered Gulley's medical bills and other expenses. Gulley then sued Operation Bass, Fishing Holdings, and Fukae, alleging claims under both the Jones Act, 46 U.S.C. § 30104, and federal maritime law. Specifically, Gulley alleged that all three parties had been negligent and that the two companies had failed to provide a seaworthy vessel and had failed to pay money owed to him as an injured seaman.

The district court granted summary judgment to Operation Bass and Fishing Holdings, but allowed the negligence claim against Fukae to proceed to a bench trial. Hartford Insurance then moved to intervene as a third-party plaintiff for reimbursement of the workers' compensation payments it had made to medical providers on Gulley's behalf.

Fukae admitted fault on the eve of trial, so the bench trial served only to calculate damages. The court thereafter awarded Gulley $497,500 in damages, of which $165,558.92 were medical expenses. Hartford moved to recover $189,361.61 as reimbursement, and the district court granted the motion. These appeals followed.

II.

We review the district court's grant of summary judgment de novo. *Hanrahan v. Mohr*, 905 F.3d 947, 953 (6th Cir. 2018).

A.

Gulley first argues that the district court erred when it granted summary judgment to Operation Bass on his claim that the Ranger was "unseaworthy" under federal maritime law. (Like the district court, we assume without deciding that Gulley was a "seaman" under the Jones Act and federal maritime law.) Plainly the Ranger was seaworthy: it was more than "reasonably fit"

for its "intended use," which was to carry a fisherman and a cameraman around Lake Kentucky for a day of bass fishing. *See Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006).

Gulley responds that the loose pedestal seat made the boat unseaworthy. "A vessel's condition of unseaworthiness might arise from any number of circumstances," *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971), including "the misuse of properly functioning equipment . . . if the misuse occurs at the direction of a superior." *Churchwell*, 444 F.3d at 904. But Gulley provides no evidence that Operation Bass intended that the pedestal seat be left in the aisle while the boat was underway. Instead, Fukae removed the seat himself and—despite the space available for the pedestal seat to be stored safely—placed the seat in the aisle. No one told Fukae to do that. Hence this argument fails.

Gulley also contends that the Ranger was unseaworthy because it lacked a foot throttle, which Gulley says would have made the boat "safer." But Gulley has no evidence to support that proposition either; and meanwhile the question is whether the boat was "reasonably fit" for its "intended use," not whether it could have been safer. Hence this argument too is meritless.

Gulley also cites two presumptions from admiralty law. First, the so-called "Oregon Rule" creates "a rebuttable presumption that, when a moving object hits a stationary object, the moving object is at fault." *See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 361-62 (6th Cir. 2010). But this presumption merely allocates fault between the owners of the moving object and the stationary one—a posture not presented here. *See id.* Second, the First Circuit has created "a presumption of unseaworthiness" when "a vessel sinks in calm waters." *See Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 8 (1st Cir. 2001). A shipowner can rebut this presumption, however, by producing evidence "from which a factfinder could determine that the

vessel sank for some reason other than the alleged unseaworthy condition." *Id.* And here the "other" reason is obvious: Fukae failed to look ahead and crashed into a bridge. The district court therefore correctly granted summary judgment on Gulley's claim of unseaworthiness.

B.

Gulley also argues that the district court erred when it granted summary judgment to Operation Bass on his negligence claim. *See* 46 U.S.C. § 30104; *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 415-16 (2009). To prove negligence, Gulley must show that his employer, Operation Bass, failed to protect him from "obvious dangers" that Operation Bass "knew or should have known" about. *Churchwell*, 444 F.3d at 907.

Here, Gulley contends that Operation Bass was negligent because Fukae had asked if he could leave the pedestal seat ashore. Per tournament rules, however, an official barred Fukae from doing so. But again it was by no means "obvious" that this command would lead to Fukae laying the seat in the aisle, becoming distracted by it, and then crashing the Ranger into the bridge. The district court thus correctly granted summary judgment to Operation Bass.

C.

Gulley argues that Operation Bass owes him medical expenses under federal maritime law. A shipowner must provide an injured seaman "cure," which as relevant here includes certain medical expenses. *See Skowronek v. Am. S.S. Co.*, 505 F.3d 482, 484-85 (6th Cir. 2007). But Operation Bass's insurer, Hartford, already paid all of Gulley's medical expenses. Thus, Gulley's argument is meritless. *See Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 588-89 (6th Cir. 1989).

D.

In appeal No. 18-6274, Gulley separately challenges the district court's order permitting Hartford to obtain reimbursement from the damages that Gulley recovered from Fukae. By way

of background, Hartford paid $165,558.92 in medical expenses that were included in the damages Gulley would otherwise receive from Fukae. Hartford therefore moved to collect that amount as reimbursement. Gulley argues that this reimbursement violated federal maritime law.

We review this question of law de novo. *See St. Clair Marine Salvage, Inc. v. Bulgarelli*, 796 F.3d 569, 574 (6th Cir. 2015). Fukae admitted liability for Gulley's injury, so Hartford was entitled to sue him for reimbursement of the payments it had made on Gulley's behalf. *See* Thomas J. Schoenbaum, Admiralty & Maritime Law § 6.35, Westlaw (database updated Oct. 2018) (collecting cases). That reimbursement would ensure that Gulley does not recover twice for the same injury. *Cf. Atl. Sounding*, 557 U.S. at 423 n.10 ("[That] a violation of the duty of maintenance and cure may also give rise to a Jones Act claim is significant only in that it requires admiralty courts to ensure against double recovery." (citation omitted)).

Here, the district court ordered Fukae to pay Gulley $165,558.92 in medical expenses. But Hartford had already paid those expenses, so Fukae in effect owed Hartford, not Gulley, the $165,558.92. Hartford was therefore entitled to reimbursement of that amount from Gulley's tort recovery. (The district court ultimately allowed Hartford to assert a lien of $189,361.61 to account for other expenses paid to Gulley, but Gulley does not challenge the amount of the lien here.) Gulley's second appeal thus fails as well.

*     *     *

The district court's judgment is affirmed.