DIRECTOR GENERAL OF the INDIA SUPPLY MISSION for and on Behalf of the PRESIDENT OF the UNION OF INDIA, Plaintiff-Appellant,

v.

S.S. MARU (ex Riverhead, ex Theokeetor), her engines, boilers, etc. and Luarca Cia. Nav. S.A., Defendant-Appellee.

No. 587, Docket 71–2177.

United States Court of Appeals, Second Circuit.

Argued March 21, 1972.

Decided April 28, 1972.

Robert E. Meshel, New York City, Baker, Nelson, Williams & Mitchell, New York City, for plaintiff-appellant.

Donald B. Allen, New York City (Hill, Betts & Nash, Eli Ellis, Edward H. Duggan, Jr., New York City, of counsel), for defendant-appellee.

Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

Appellant, the Director General of the India Supply Mission (Mission) appeals from a judgment of the United States District Court, Southern District of New York, Judge Edward C. McLean, dismissing two causes of action: (1) for damages in the sum of $6,234.11 for a shortage in delivery and contamination of plaintiff-appellant's cargo of rice; (2) for reimbursement for cargo's proportional share of contribution to a third party salvor in the sum of $146,072.64. The appellant also appeals from the judgment of the District Court awarding the defendant-appellee Luarca Cia. Nav. S.A. (Luarca) $21,760.60 with interest from September 1, 1964, on its counterclaim to recover cargo's share in contribution to General Average. We affirm.

The plaintiff-appellant Mission, a purchasing agency of the Government of India, and the defendant-appellee Luarca, a Panamanian corporation which was the registered owner of the S.S. THEO-KEETOR (subsequently renamed S.S. MARU) entered into a voyage contract of Charter Party on June 21, 1963 for the transportation of bagged rice from Lake Charles, Louisiana to a safe port in India.

Pursuant to contract, a cargo of 10,-203 long tons of rice was loaded on board the THEOKEETOR at the port of Lake Charles, Louisiana. She sailed on July 30, 1963 for a scheduled bunkering stop at Freeport, Grand Bahama Island, arriving on August 3, 1963. After taking on some 769 long tons of fuel and fresh water, the vessel waited a day because of hurricane threats, and then sailed from Freeport at 1810 hours on August 4, 1963. At 1835 hours, while headed on a course of 305°, the vessel began to vibrate and ran hard aground in approximately 24 feet of water. The master unsuccessfully attempted to free the ship using her own engines. Some 784 long tons of fuel were transferred to a lighter, and 200 long tons of fresh water were discharged in an effort to free the ship by lightening it. Two tugs were employed in a further effort to pull the ship free. All of this was to no avail and on August 8, 1963 the master of the THEOKEETOR signed a Lloyds "no cure-no pay" salvage contract with a representative of a professional salvor, Merritt-Chapman & Scott. Between August 13th and August 15th some 511 tons of rice were discharged to another vessel under the salvor's direction. With great difficulty, using 5 and eventually 8 beach gears, ships winches and a salvage boat, the THEOKEETOR was pulled free and refloated on August 15, 1963 after a week of strenuous assistance by the professional salvor. She eventually completed her voyage and discharged her cargo on September 30, 1963 in India.

The legal position of the plaintiff shipper below was that the stranding, which caused the cargo damage, the salvage and General Average expenses, was due to the unseaworthiness of the vessel which was overloaded and carried obsolete navigational charts of the area of the stranding. The position of the defendant shipowner was that the stranding was solely due to a neglect or error in navigation by the master which is an excepted peril under 46 U.S.C. § 1304(2) (a) (COGSA).

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

"   . . . ."

The charter party here incorporated COGSA and also included a New Jason Clause [1] which obligated the shipper to pay salvage costs attributable to cargo as well as General Average expenses.[2]

■■ The burden of proof is clearly on the defendant shipowner to establish that the stranding and consequent damages were due to the excepted cause of negligent navigation by the master. Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2d Cir.1963); G. Gilmore & C. Black, The Law of Admiralty § 3–43, at 162–63 (1957). We agree with the finding of the court below that the defendant has discharged its burden of proof. The master's testimony was that he did not check any chart in setting his course; that he navigated without a pilot, and that he depended upon his knowledge of the waters, making visual observations and heading on an angle with Holmes Cay which he could see ahead. The master testified:

"I knew by estimation, seeing outside; outside, I mean, the land. And I maneuvered the ship by estimation, without plotting the course for positions from the chart."

Although this type of navigation might have the virtue of simplicity, it resulted in the THEOKEETOR's running hard aground about a mile from shore.

■ The shipper has urged that the ship was unseaworthy because its charts of the Grand Bahama Island area were published in December 1939 and brought up to date only to November 25, 1944. It is not disputed that the chart was almost 20 years old and inaccurate. For this reason the vessel was unseaworthy as found by the lower court Farr v. Hain S.S. Co., 121 F.2d 940, 945 (2d Cir.1941); The Maria, 91 F.2d 819, 824 (4th Cir.1937). This however does not end inquiry. Where the carrier has brought itself, as in this case, within the excepted peril of negligent navigation, the burden then shifts to the cargo owner to establish that the unseaworthiness caused the damages sought. "Therefore once the carrier has brought forth evidence establishing the defense of error in management the burden is on the shipper to show that the ship was unseaworthy and that the damage was caused by such unseaworthiness." Firestone Synthetic Fibers Co. v. M/S Black Heron, 324 F.2d 835, 837 (2d Cir.1963).

■■ We agree that this burden was not sustained. The chart was obviously inaccurate since on August 5, 1963, the

1. "NEW JASON CLAUSE:

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

"If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the Carrier before delivery."

2. In this case the salvage award to the salvor was fixed pursuant to arbitration at the sum of $160,000. Plaintiff was obligated to pay its proportionate share ($146,072.64) in order to prevent the salvor's assertion of a lien on the cargo. The additional General Average contribution of cargo ($21,760.60) which was not paid and which is sought by counterclaim of the defendant shipowner entailed salvage expenses not owing to the professional salvor but incurred in the initial efforts of the vessel to free itself from the stranding. There is no dispute as to the amount of these awards or their apportionment.

day after the strand, the master plotted his position on the chart and according to it he was in some 120 feet of water. The chart moreover was faulty in other respects such as the location of a lighthouse which had been moved since 1944 and it even showed an erroneous configuration of the island. However, the trial court found that the master had not relied upon the chart but was sailing solely by visual observation hence the chart could not have possibly been the cause of the strand. We agree therefore with the finding that the master's negligence in navigation was the cause of the strand.[3]

■ A somewhat stickier problem arises as to the shipper's claim that the vessel was unseaworthy by reason of overloading in violation of the Load Line Act, 46 U.S.C. §§ 85–85g. The lower court found that the THEOKEETOR was overloaded when she began her voyage at Lake Charles. Her mean draft at that time, according to the stowage plan, was 28′ 7½″ which exceeded the prescribed salt water draft of 27′ 09″, by some 10½ inches. The lower court accepted the evidence of plaintiff's expert that her displacement at the time of stranding (after she had taken on bunkers of fuel and fresh water) was 14,915 long tons which, at a submersion rate of 48.5 long tons per inch, would indicate a draft of 28′ 10″. The lower court concluded she was overloaded by some 670 long tons and was 13 inches deeper in the water than she should have been. We cannot characterize this as a clearly erroneous finding. While the computation was based on the immersion scale of a standard five hatch Liberty ship and there was some evidence that the THEOKEETOR had minor modifications, the defendant offered no contrary evidence and the estimate, although admittedly approximate, must be accepted. The relationship between the overloading and the strand therefore becomes crucial. Since the THEOKEETOR went aground in water about 24 feet deep she would, in any event, have gone aground if she had drawn only 27′ 09″ of water. This fact does not appear to be seriously contended. Plaintiff shipper's main arguments are two-fold —first, that the overloading made the vessel more difficult to maneuver. When she began to vibrate, it is urged that the vessel could have been steered away from the strand but for the overloading. The testimony of the master which is uncontradicted, refutes this contention. The period of vibration was only momentary before the vessel hit hard ground. There was no time and, in fact, absolutely no effort was made to change the course which the master had directed the helmsman to steer. Hence the shipper's argument is purely hypothetical and not convincing in light of the master's testimony.

The second contention of the shipper is that the overloading made the use of the professional salvor necessary—if the vessel had been loaded within the allowable limit, the argument runs, she could have been lightened and refloated by the use of the tugs and the lighter employed before the expensive salvage operation commenced. Plaintiff's argument is based upon the contention that although 784 long tons of fuel and 200 long tons of water had been removed prior to the employment of the professional salvor, the salvor only had to remove 511 long tons of cargo before the vessel was refloated. The plaintiff argues that if the vessel had not been overloaded by some 670 tons, or 159 tons in excess of the

3. Although the "clearly erroneous" test of 52(a) Fed.R.Civ.P. does not apply to findings of negligence or lack of negligence, the conclusion of the District Court judge will ordinarily stand unless the lower court "manifests an incorrect conception of the aplicable law." In re Vessel Marine Sulphur Queen, 460 F.2d 89 (2d Cir., 1972) ; Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 813 (2d Cir. 1971) ; Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2d Cir. 1969) ; Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776 (2d Cir.) cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

511 tons of cargo which the ship was required to discharge, it could have been refloated merely by discharge of the 984 long tons of fuel and water, without having to employ a salvor.

■ Plaintiff urges on appeal that the lower court erroneously found that the 984 tons of bunker fuel and water were removed after the salvor had been hired and therefore it missed the significance of the salvor's removing only 511 tons of cargo. The paragraph in which the alleged erroneous finding of fact appears does not purport to be a precise statement of the time schedule of the lightening operations. The language employed is ambiguous and could be susceptible of the interpretation drawn by the shipper.[4] However, there is no indication that the trial court was at all confused as to the sequence of events, as a reading of the entire record and the judge's questioning of counsel and the witnesses clearly establishes. Aside from this, the court found as a fact that the vessel ran "hard aground" and that she was freed only after considerable difficulty. "The prolonged operations that were required to float the ship, as disclosed by the testimony, show that the vessel was stuck very fast." A reading of the deck log extracts of the THEOKEETOR amply demonstrates that refloating the vessel required seven days of complicated extrication efforts using a salvage vessel, 8 beach gears and ships winches before the ship even budged. In fact, the vessel was not refloated until her mean draft was reduced to 26' 04" or 17 inches less than the prescribed 27' 09". The survey report, which is in evidence, indicated 14 items of damage to the vessel as a result of the stranding, with repairs estimated at $76,485. In view of this evidence the finding of the court below that simple overloading was not the cause of the expense of unstranding, is fully supported by the record.

■ The lower court held that the defendant had the burden of establishing that the overloading was not the cause of the stranding. As we have pointed out, the burden of establishing unseaworthiness and that the damage was caused by such unseaworthiness is on the shipper (Firestone Synthetic Fibers Co. v. M/S Black Heron, 324 F.2d 835, 837 (2d Cir. 1963)). However, the plaintiff successfully maintained below that since the ship was overloaded in violation of the Load Line Act, the *Pennsylvania* rule applied. In The Pennsylvania 86 U.S. (19 Wall.) 125, 136, 22 L. Ed. 148 (1874) the Supreme Court stated:

> "But when . . . a ship at the time of a collision is in actual violation of a statutory rule *intended to prevent collisions*, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute." (Emphasis added).

■ Even applying the *Pennsylvania* test, the court below found that the overloading could not have had anything to do with the stranding,[5] finding that the sole cause of the mishap was an er-

---

4. "The Theokeetor was finally floated, after considerable difficulty on August 15, 1963, with the aid of a salvage tug, the Cable, owned by Merritt-Chapman & Scott Corp., with whom the master signed a 'no cure-no pay' salvage agreement on August 8, 1963. Before this could be accomplished, it was necessary to lighten the vessel by transferring fuel to a lighter and part of her cargo to another ship." Query does

"Before" refer to August 8th or August 15th?

5. The only witness to testify that had the vessel not been overloaded it could have been refloated without a professional salvor, was admittedly not an expert on salvage operations and his opinion was not accepted by the trial court. However, the shipowner introduced no testimony at all on this point.

ror of navigation. While this finding is supportable, we cannot agree that the *Pennsylvania* rule is applicable.

Although the *Pennsylvania* rule is not now limited to collision cases, In re Seaboard Shipping Corp., 449 F.2d 132, 136 (2d Cir. 1971), cert. denied Seaboard Shipping Corp. v. Moran Inland Waterways Corp., 406 U.S. 949, 92 S.Ct. 2038, 32 L.Ed.2d 337; 406 U.S. 949, 92 S.Ct. 2039, 32 L.Ed.2d 337 (1972); but see Wilkins v. American Export Isbrandtsen Lines, Inc., 446 F.2d 480, 485–486 (2d Cir. 1971), cert. denied, 404 U.S. 1018, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972), we are not inclined to apply it here. It has been properly characterized as a "drastic and unusual presumption" G. Gilmore & C. Black, The Law of Admiralty § 7–5, at 404 (1957).[6] The rule, as articulated by the Supreme Court, was limited to the violation of a statute intended to prevent the catastrophe which actually transpired.

The prime motivation of the initial load line legislation in Britain, which was sponsored by Samuel Plimsoll, M.P., was to save the lives of seamen. "The interest of shipowners led them, in early times, to load vessels to a point beyond safety; the greater the weight of the vessel's load, of course, the lower she rides in the water, and the more vulnerable she is to heavy seas. Many seamen consequently lost their lives."[7] The maintenance of adequate freeboard (a measure of reserve buoyancy) assured greater maneuverability and stability and in heavy seas minimized the danger to life and limb of the seamen on deck or damage to or loss of cargo.[8] Ob-

6. Although we find that *The Pennsylvania* rule by its own terms is not applicable in this case, it is in my view (as to which Judge Mansfield takes no position) an anomaly which is no longer supportable. Where COGSA rules of burden of proof would be otherwise aplicable, there is no reason to apply *The Pennsylvania*. The burden of proof rules in COGSA represent a studied statutory scheme in a difficult area. (See Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2d Cir. 1962); CIA. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. 884 (D. M.D.1967); G. Gilmore & C. Black, The Law of Admiralty § 3–43, at 162–63 (1957); Comment, Cargo Damage at Sea: The Ship's Liability, 27 Texas L. Rev. 525 (1949). Marine safety statutes should be enforced irrespective of loss and whatever sanctions they provide should be exacted where violated. However, to utilize their breach for the imposition of a drastic burden of proof rule, is in my view illogical and inequitable. The unequal bargaining power of the ship owner which created the predictable inequities of the contract of adhesion, have been remedied in large measure by COGSA. Hence where it is applicable, the *ad hoc* judicial spleen of *The Pennsylvania* (which predated even the Harter Act) provides in my view a punitive response no longer necessary.

7. G. Gilmore & C. Black, *supra* note 6, § 11–12, at 779. See also C.R. Benstead, Shallow Waters 385 n. 1 (1958) "A ship's load-lines or Plimsoll marks are placed so as to give her adequate freeboard, and therefore buoyancy, in any weather she is likely to meet"; and W. Winter, Marine Insurance 75 (3d ed. 1952) a vessel, loaded to capacity, "would not be seaworthy, because the least additional weight, such as that of a wave breaking on the deck, would cause the vessel to sink . . ."

8. A reading of the Congressional debates shows that in enacting the first American load-line legislation for ocean-going vessels, the prime concern of the legislators was the sinking of ships on the high seas during storms. Exceptions from the load-line laws were sought for timber schooners and ships engaged in the coastwise trade. The argument in favor of exempting the former was that the schooners were virtually unsinkable, 70 Cong.Rec. 3793 (remarks of Representative Welsh), 3973 (remarks of Representative Johnson) (1929). The reason for exempting ships in the coastwise trade was given by Senator Copeland:

"You can see, Mr. President, that how much load a ship can carry makes a great difference in its position upon the seas. If the vessel is all the time near shore, and in time of storm or stress at sea may scurry to cover, it can carry a heavier load. It is proper for it to carry a heavier load, because if storm approaches it can go to a safe haven. On the other hand, where a vessel is going out upon the wide expanses of the ocean, we must make certain that the vessel is not overloaded or sailing under conditions which may make for disaster. If

viously the lower the ship is in the water, the more likely it will run aground in shallow waters, however, stranding in these circumstances would be primarily due to negligent navigation. On the other hand, lack of maneuverability and inadequate freeboard in heavy seas is clearly hazardous to crew and cargo, and the danger cannot be avoided by navigational skills. Appellant has not cited, and we have not found, any case where stranding due to overloading has called for the application of the *Pennsylvania* rule. Richelieu & Ontario Navigation Co. v. Boston Marine Insurance Co., 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398 (1890) did involve a stranding and the rule was applied but the statute violated was one which required a moderated speed in foggy conditions. The rule was disregarded and the ship ran aground on an island. Obviously the statute's purpose was to preclude this very misadventure. Petition of Long, 439 F.2d 109 (2d Cir. 1971) involved overloading which resulted in the sinking of the vessel causing the death of crewmen and the loss of cargo. The overloading there caused the starboard rail to be rapidly and permanently submerged. Cargo then listed reducing freeboard. This again was the very danger that load line legislation was designed to prevent.[9] To accept the theory that every violation of every safety statute would call into play the *Pennsylvania* rule irrespective of the purpose of the statute and the danger which it was intended to prevent, would in effect emasculate the burden of proof scheme of COGSA. Finding the rule not applicable we have no question but that the plaintiff shipper failed to carry its burden of establishing that the overloading caused the strand and the consequent damage to ship and cargo.

This leaves us with the question of plaintiff's claim for cargo damage in the amount of $6,234.11. Appellant urges that, having established delivery to the carrier in good condition, the burden of production then shifted to the carrier to show that the damage was caused by one of the excepted perils under COGSA. No proof was ever submitted by the carrier as to how the spoilage and shortage occurred and hence it is argued the lower court erred in dismissing this claim. We do not challenge appellant's state-

---

any Member of the Senate has been in a storm at sea, he knows how terrifying it is, and what the conditions are." 70 Cong.Rec. 4829–30 (1929)

Ships operating in the intercoastal trade were exempted from the 1929 legislation—though certainly vessels operating close to shore are more prone to the hazard of stranding than their ocean-going counterparts.

While Representative La Guardia alone did make some general references to strandings in his discussion of the loadline legislation, his main reason for supporting the law, like that of the bill's other supporters, was to protect ships from sinking. "In the face of these figures [Coast Guard statistics on the loss of lives and property in American waters from 1924 to 1928, e. g., 'in 1927 on the Great Lakes the total losses were 7 ships foundering, 5 stranded, 1 collision, and 7 attributed to other causes'], in the face of the hundreds of lives lost every year, in the face of the hundreds of ships that *founder*, there is not a man on the floor of this House who can stand up and say that overloading a ship is not a contribut-

ing factor to the loss of the ship." 70 Cong.Rec. 3962–63 (1929) (emphasis added).

9. See also In re Seaboard Shipping Corp., 449 F.2d 132 (2d Cir. 1971) (Overloading led to swamping of barge and two of the crew swept overboard). In Andros Shipping Co., Ltd. v. Panama Canal Co., 298 F.2d 720 (5th Cir. 1962) there was overloading plus other statutory violations. The vessel sheered in the Panama Canal. The sheering was due to the overdraft of the vessel as well as other violations and the *Pennsylvania* rule was followed "The accident of the Andros Venture was of the sort that the safety statutes were designed to prevent . . . ." *Id.* at 728. In The Denali, 112 F.2d 952 (9th Cir.), cert. denied, Alaska S.S. Co. v. Pacific Coast Coal Co., 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444 (1940), the *Pennsylvania* rule was applied to a stranding but the statute violated involved overworking of the ship's crew which was aimed against the dangers of a weary navigator directing a ship.

ment of the law however the reason that the record is barren of evidence as to the cargo claim, is simply that the plaintiff treated all three as claims for damage resulting from the stranding. The record reveals that counsel for plaintiff, in his opening statement to the court, stated:

"We are claiming, your Honor, that this stranding occurred by reason of the vessel being unseaworthy. If that allegation is correct, we claim, No. 1, we don't have to contribute because it is not a legitimate general average situation; we claim, No. 2, that any cargo loss or damages as a result of such stranding we can recover under the United States Carriage of Goods by Sea Act which is made applicable by the charter party; and thirdly, we claim that because the vessel stranded as a result of an unseaworthy condition we were forced to pay to this third party an amount in the sum of approximately $146,000 . . . ."

Counsel for the plaintiff adhered to this theory in his closing remarks to the court:

"The Court: So you are claiming that this damage to cargo was caused by the unseaworthiness of the vessel?

"Mr. Meshel: Yes, caused during the stranding, and the stranding was caused by the unseaworthiness of the vessel.

"The Court: And that's the same claim you make with respect to the other two parts of it?

"Mr. Meshel: No question, it is all one ball of wax."

This accounts for the court's finding: "The master testified that on arrival in India, some of the cargo was damaged. Presumably this occurred during the transfer of part of the cargo from the Theokeetor to another vessel in order to lighten the ship."

■ Having taken the position below that the liability for cargo damage was on precisely the same footing as the claim to recoup salvage costs, whatever error is alleged now was induced by appellant's position below and hence it cannot complain. See Remington Rand, Inc. v. United States, 202 F.2d 276 (2d Cir. 1953).

Affirmed.