# United States Court of Appeals
## For the First Circuit

No. 23-1359

GREAT LAKES INSURANCE SE,

Plaintiff, Appellant,

v.

MARTIN ANDERSSON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Gelpí, Howard, and Rikelman,
Circuit Judges.

Michael I. Goldman, with whom The Goldman Maritime Law Group was on brief, for appellant.
Michelle M. Niemeyer, with whom Michelle M. Niemeyer, P.A., Harvey B. Heafitz, and Davagian Grillo & Semple LLP, were on brief, for appellee.

December 22, 2023

**GELPÍ, Circuit Judge.** Defendant-Appellee Martin Andersson ("Andersson") purchased an insurance policy ("policy") for his vessel, the Melody ("vessel"), from Plaintiff-Appellant Great Lakes Insurance SE ("Great Lakes") in November 2018. In December 2019, the vessel ran aground off the coast of the Dominican Republic. Great Lakes brought a declaratory judgment action to determine coverage under the policy and Andersson filed counterclaims for breach of contract and equitable estoppel. Great Lakes moved for summary judgment on its declaratory judgment claim and Andersson moved for partial summary judgment on his breach of contract claim. Great Lakes' motion was denied, and Andersson was granted partial summary judgment on his breach of contract claim. Great Lakes now appeals the denial of its motion for summary judgment, and entry of summary judgment in Andersson's favor, claiming the district court erred as a matter of law in refusing to apply the policy's definition of seaworthiness.[1] We affirm.

---

[1] This interlocutory appeal is properly before us pursuant to 28 U.S.C. § 1292(a)(3) because it determines the rights and liabilities of the parties to an admiralty case. See Great Lakes Ins. SE v. Andersson, 66 F.4th 20, 22 (1st Cir. 2023) (stating interlocutory appeal in admiralty law is properly before the court pursuant to 28 U.S.C. § 1292(a)(3)); United States v. Nature's Way Marine, L.L.C., 904 F.3d 416, 419 n.5 (5th Cir. 2018) (exercising jurisdiction over appeal from ruling of partial summary judgment). In a previous decision, we held that the policy's choice of law provision does not bar Andersson from bringing an unfair-settlement-practices counterclaim under Massachusetts law. See Andersson, 66 F.4th at 22. This appeal does not involve that claim, so we omit any further reference to it.

- 2 -

# I. Background

## A. Facts[2]

In November 2018, Andersson purchased an insurance policy from Great Lakes which afforded $365,000 in first party property damage coverage for his vessel and covered Florida, the Bahamas, and the Caribbean.[3]  The policy was issued in December 2018.  The policy's seaworthiness warranty stated that "[i]t is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement.  Breach of this warranty will void this insuring agreement from its inception." The policy defined "seaworthy" as:

> [F]it for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew.  For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use.

The policy defined "Scheduled Vessel" as:

> [T]he vessel described on the declaration page, including machinery, electrical equipment, sails, masts, spars, rigging, and all other equipment normally required for the operation and maintenance of the vessel and situate on the Scheduled Vessel, which would normally be sold with the vessel.  This does not include

---

[2] The relevant facts for review of summary judgment are undisputed, except as noted.  See Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 5 (1st Cir. 2001).

[3] Great Lakes claims that Andersson chose the locations, whereas Andersson claims the broker chose the locations with little input from him and that his language barrier prevented him from specifying the correct locations.

spare parts of the Scheduled Vessel, the Scheduled Vessel's life raft, tender or dinghy unless the same has been declared on the declaration page, nor does it include any items being stored on premises other than on board the Scheduled Vessel.

Andersson alleges that he intended to pick up the vessel in Grenada after it was repaired and sail to Aruba before he ended his journey in Sint Maarten.[4]  It is unclear whether there were, or were not, any paper charts on the vessel at the time of the policy's inception.[5]

On December 14, 2019, Andersson left Aruba for Sint Maarten having checked the weather forecasts for the intended route without issue.  The intended route was around the southeastern tip of Aruba, then northeast to clear the Venezuelan Islands. Andersson then planned to head east toward Grenada and then north to Sint Maarten.  After rounding the southeastern tip of Aruba and attempting to head northeast, the winds increased and caused his crewmember to become seasick.  Andersson headed more northward, attempting to avoid damage from the waves and ease his crewmember's seasickness.  Eventually, the winds pushed Andersson northwesterly toward the Dominican Republic, at which point he realized his radio

_____

[4] While commonly referred to as Saint Martin, we chose to provide the island's proper Dutch name, Sint Maarten.

[5] Great Lakes claims that at the inception of the policy, the only current paper charts on the vessel were for the Leeward Islands, Windward Islands, and Aruba.  Andersson, however, claims that there is no evidence that any paper charts were on the vessel at the inception of the policy.

- 4 -

transmitter was broken.  He called the agent who sold him the vessel who suggested Andersson dock in Boca Chica, Dominican Republic, for repairs.

On December 17, 2019, within the policy's period of coverage, while waiting to dock in Boca Chica, the vessel ran aground on a breakwater.  It is undisputed that at the time the vessel left for its voyage, the same had updated paper charts onboard for the Leeward Islands, the Windward Islands, and Aruba, all of which were on Andersson's intended course from Aruba to Sint Maarten.  The vessel also had electronic charts on its Garmin GPS for the Dominican Republic which were outdated and did not show the breakwater.[6]  More current charts that were available, but not on board, in December 2018 did show the breakwater.  The other GPS onboard, the Raymarine, did not have charts for the Dominican Republic.  It is also undisputed that the vessel lacked up-to-date paper charts for Florida, the Bahamas, and the Western Caribbean during the trip from Aruba to Sint Maarten.

## B. Procedural History

Following the breakwater incident, Andersson requested coverage and Great Lakes filed a declaratory judgment to determine whether the loss of the vessel was covered by the policy, claiming

---

[6] Andersson disputes the fact that the Garmin was never updated, however, it is undisputed that the Garmin did not show the breakwater and that updated Garmin charts did.

the vessel was unseaworthy due to the lack of up-to-date paper charts for Florida, the Bahamas, the Western Caribbean, and the Dominican Republic. Thereafter, before judgment, Great Lakes denied coverage claiming Andersson neglected to maintain the vessel in a seaworthy condition per federal admiralty law and the policy. Andersson counterclaimed, alleging a claim of breach of contract and a claim of equitable estoppel. As to the breach of contract claim, Andersson alleged that the vessel was seaworthy at all times, maintaining up-to-date paper charts for its intended voyage. Great Lakes moved for summary judgment on its declaratory judgment claim, alleging that the lack of updated paper charts for Florida, the Bahamas, the Western Caribbean, and the Dominican Republic rendered the vessel unseaworthy. Andersson filed a motion for partial summary judgment on the breach of contract claim.

The district court held a summary judgment motion hearing on December 19, 2022, before issuing its order on March 21, 2023. The district court denied Great Lakes' motion for summary judgment and granted Andersson's motion for partial summary judgment. The district court determined that Great Lakes had not proven that the vessel was unseaworthy under federal admiralty law and the policy. The district court granted Andersson's motion for summary judgment as to his breach of contract claim, and denied Great Lakes motion for summary judgment as to its declaratory judgment claim.

## II. Discussion[7]

Great Lakes makes a single argument on appeal: The district court erred as a matter of law by refusing to enforce the policy's express definition of seaworthiness. But in making this argument, Great Lakes also relies on the absolute implied warranty of seaworthiness, which it contends was incorporated into the policy. Great Lakes claims that the policy's express warranty of seaworthiness is at least coextensive with the implied warranty of seaworthiness based in federal admiralty law, and that the district court erred by interpreting this implied warranty too narrowly. But even if the implied warranty of seaworthiness does not require a vessel to carry up-to-date charts for every single location that could be navigated under the policy's coverage area, Great Lakes argues that the policy's plain language imposes such a requirement. Because the policy's express warranty requires a vessel to have adequate "parts, equipment and gear" to be seaworthy, Great Lakes asserts that the district court violated fundamental principles of

_____

[7] Great Lakes and Andersson both make references to "charts," "paper charts," and "electronic charts" in their briefs. Throughout the discussion, we use the terms "charts" and "paper charts." However, regardless of the term used, our ruling applies to any type of chart.

- 7 -

contract interpretation by finding that the policy did not require the vessel to have the charts on board.

Ultimately, we must determine whether either warranty required the vessel to carry up-to-date charts for all geographic areas covered by the policy in order to be considered seaworthy. We begin with the implied warranty of seaworthiness. Like the district court, we find no precedent to suggest that the implied warranty imposes such a requirement. Therefore, we proceed to the express terms of the policy.

## A. Standard of Review

A district court's summary judgment ruling is reviewed de novo. O'Neill v. Baker, 210 F.3d 41, 46 (1st Cir. 2000). In this case, Andersson filed a cross-motion for summary judgment, but "[t]he presence of [the same] neither dilutes nor distorts this standard of review." Mandel v. Bos. Phx., Inc., 456 F.3d 198, 205 (1st Cir. 2006). "[W]e must scrutinize the record in the light most favorable to the summary judgment loser . . . ." All. of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

## B. Absolute Implied Warranty of Seaworthiness

Under admiralty law, there is an absolute implied warranty applicable to all marine insurance contracts.[8] See

---

[8] Under American federal admiralty law, there are two distinct implied warranties that attach to all time hull policies: the absolute implied warranty that attaches at inception, and the continuing implied warranty that is recognized at the commencement

Labarca, 260 F.3d at 7.  The absolute implied warranty requires that the insured vessel be seaworthy at the inception of the policy.  See Schoenbaum, supra, at 505-06; Emps. Ins. of Wausau v. Occidental Petroleum Corp., 978 F.2d 1422, 1431-32 (5th Cir. 1992). If the vessel is not seaworthy at the policy's inception, then the policy is void.  See Schoenbaum, supra, at 507.  The insurer bears the burden of proving the unseaworthiness.  See Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liber.), 952 F. Supp. 1046, 1067 (S.D.N.Y. 1997).  "[S]eaworthiness can be established by demonstrating that the vessel was well-maintained."  Carib Resorts, Inc. v. Watkins Underwriters at Lloyds, Syndicate No. 457, No. 16-25024-CV-GRAHAM/SIMONTON, 2018 WL 8048755, at *16 (S.D. Fla. Mar. 20, 2018) (citing Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc., No. 8:12-cv-2923-T-33TGW, 2014 WL 12573013, at *5 (M.D. Fla. June 16, 2014)).  "[A] finding of unseaworthiness is

---

of each individual voyage the vessel takes.  See Thomas J. Schoenbaum, Admiralty and Maritime Law 505-07 (6th ed. 2018 & Supp. 2023).  Both Great Lakes and Andersson refer to, and seem to accept, both implied warranties in their briefs.  The district court also utilized both implied warranties in its summary judgment order.  However, Great Lakes stated that this appeal pertains only to "the first warranty, the absolute warranty of seaworthiness that applies at the inception of every policy of marine insurance" as its argument concerns the vessel's seaworthiness at the time of the inception of the policy, not its continuing seaworthiness. Therefore, we omit discussion on the second implied warranty of seaworthiness and focus only on the absolute implied warranty.

not affected by whether the owner was or was not negligent or at fault." Labarca, 260 F.3d at 8.

The cases considering the issue find that the absolute implied warranty concerns whether the physical condition of the vessel and its equipment are sufficient for the vessel's intended use. See Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 331 (1960) (discussing whether a worn grip on a wrench rendered the vessel unseaworthy); Martinez v. Sea Land Servs., Inc., 763 F.2d 26, 27-28 (1st Cir. 1985) (determining a summary judgment ruling was erroneous because seaworthiness extends to a plastic sleeve covering a box); Axis Reinsurance Co. v. Resmondo, No. 8:08-cv-569-T-33TBM, 2009 WL 1537903, *4 (M.D. Fla. June 2, 2009) (determining whether fractured gimbal ring rendered vessel unseaworthy at inception); Royal Ins. Co. of Am. v. Deep Sea Int'l, No. 02 Civ. 3175 (KMW)(FM), 2006 WL 8454021, *6-8 (S.D.N.Y. Mar. 24, 2006) (discussing repair and maintenance of the vessel in regard to absolute implied warranty). "A vessel is unseaworthy if it is not fit and 'is unable to withstand the perils of an ordinary voyage.'" Home Ins. Co. v. Pan Am. Grain Mfg. Co., Inc., 397 F.3d 12, 13 n.2 (1st Cir. 2005) (quoting Unseaworthy, Black's Law Dictionary (6th ed. 1990)); Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199 (1st Cir. 1980) ("[T]emporary and unforeseeable malfunction or failure of a piece of equipment under proper and expected use is sufficient to

establish . . . unseaworthiness . . . ."); cf. United States v. Rivera, 131 F.3d 222, 233 n.16 (1st Cir. 1997) (Torruella, J., concurring) ("The warranty of seaworthiness provides that the owner of a vessel owes an absolute duty to seamen to provide a ship's hull, gear, appliances, ways, and appurtenances which are reasonably fit for their intended purpose, Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S. Ct. 926, 4 L.Ed.2d 941 (1960), as well as to appoint a competent master and a crew adequate in their number and competent for their duty, Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S. Ct. 514, 27 L.Ed.2d 562 (1971).").

To make the vessel seaworthy under the absolute implied warranty, Andersson was not required to keep up-to-date paper charts on board for every covered location from the inception of the policy. Great Lakes contends that the district court "refuse[d] to consider whether the lack of current, updated charts rendered the [v]essel unfit for its 'intended purpose' at the inception of the [p]olicy." This is simply incorrect. The district court did consider this in the context of the absolute implied warranty of seaworthiness when it found that "there are no cases in which the court held that a lack of up-to-date maps voids an insurance policy from its inception under the [f]irst [w]arranty; the [c]ourt found none where the argument was even made." In addition, the district court found that Great Lakes was

- 11 -

not claiming a deficiency in the physical condition of the vessel, therefore the absolute implied warranty does not apply.

As noted above, the absolute implied warranty has been interpreted by caselaw to pertain to the physical condition of the vessel. There have been no cases that have determined out-of-date paper charts to be a violation of the absolute implied warranty of seaworthiness. In addition, Great Lakes' argument that up-to-date paper charts for any location the vessel could navigate during the entirety of the policy coverage area are required on the vessel at the inception of the policy is simply unreasonable. It is difficult to ascertain how Andersson could predict exactly where his vessel would dock in every port in the Caribbean if the dock were not on his intended voyage, let alone account for the myriad of updates that might occur over the course of the policy. Therefore, the absolute implied warranty, which attaches at the inception of the policy and renders the policy void if the vessel was unseaworthy, does not support Great Lakes' argument that up-to-date charts for every location that could be navigated under the entirety of the coverage area are required when the policy attaches to deem a vessel seaworthy.

The cases that Great Lakes cites do not alter this conclusion. Although the existence of up-to-date paper charts may go to a breach of the continuing implied warranty of seaworthiness, not at issue here, the cases that Great Lakes cites do not stand

for the proposition that a vessel must have up-to-date paper charts from the policy's inception to satisfy the absolute implied warranty of seaworthiness.  Crucially, the cases cited analyze only whether the party responsible for that breach met the privity or knowledge portion associated with that continuing implied warranty, not the absolute implied warranty, or had knowledge of the condition pursuant to the Carriage of Goods by Sea Act.[9]

---

[9] See Cont'l Ins. Co., 952 F. Supp. at 1070; Union Oil of Cal. v. M/V Point Dover, 756 F.2d 1223, 1229 (5th Cir. 1985) (analyzing whether the failure to keep up-to-date charts and maps breached the continuing implied warranty based on actual knowledge); Dir. Gen. of India Supply Mission for & ex rel. President of Union of India v. S.S. Maru, 459 F.2d 1370, 1371 (2d Cir. 1972) (considering whether the defendant could successfully raise the defense of the shipowner's negligence under the Carriage of Goods by Sea Act); The W.W. Bruce, 94 F.2d 834, 837 (2d Cir. 1938) ("The burden of proving the exercise of due diligence to make the ship seaworthy is upon the owner . . . ." (emphasis added)); The Maria, 91 F.2d 819, 824 (4th Cir. 1937) (asking whether the shipowner exercised "due diligence" under the continuing implied warranty); Matter of Complaint of Supreme Towing Co. Inc., No. 07-9231, 2010 WL 11561150, at *22 (E.D. La. Aug. 12, 2010) ("Having established that the CAPT. BRENNAN was unseaworthy, and that the CAPT. BRENNAN's unseaworthy condition was the proximate cause of its allision with Well #14, the Court must now determine whether Supreme Towing had privity or knowledge of the CAPT. BRENNAN's unseaworthy condition."); In re TT Boat Corp., No. CIV A 98-494, 1999 WL 223165, at *10–11 (E.D. La. Apr. 14, 1999) (analyzing under 46 U.S.C. § 183(a) whether the captain possessed knowledge of the lack of up-to-date charts that led to the vessel's unseaworthiness); Complaint of Thebes Shipping, Inc., 486 F. Supp. 436, 438 (S.D.N.Y. 1980) (discussing COGSA's due diligence standard); Complaint of Delphinus Maritima, S.A., 523 F. Supp. 583, 593 (S.D.N.Y. 1981) ("Having brought this action, the initial burden was on the vessel owner to show no fault on its part or if there was fault, that the fault was without personal knowledge." (citing Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1155 (2d Cir. 1978))).

## C. Express Warranty of Seaworthiness

We next consider whether the policy's express seaworthiness warranty required Andersson to carry the charts in question. Under New York law, which governs the policy here, "the [c]ourt should interpret an insurance contract 'to give effect to the intent of the parties as expressed in the clear language of the contract.'" Royal Indem. Co. v. Deep Sea Int'l, 619 F. Supp. 2d 14, 18 (S.D.N.Y. 2007) (quoting Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006)). "An insurance policy should be read in light of common speech and the reasonable expectations of a businessperson." Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 788 N.Y.S.2d 142, 144 (N.Y. App. Div. 2004) (internal quotation marks and citation omitted). Each provision should be given "full meaning and effect." LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp., 424 F.3d 195, 206 (2d Cir. 2005) (quoting Shaw Grp., Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003)). In addition, "[t]he rule that insurance policies are to be construed in favor of the insured is most rigorously applied in construing the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability." Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 306 (2d Cir. 1987). These insurance policies "are to be accorded a strict and narrow construction." Pioneer Tower Owners Ass'n v. State Farm Fire &

Cas. Co., 908 N.E.2d 875, 877 (N.Y. 2009). "Every clause or word is deemed to have some meaning." Mazzaferro v. RLI Ins. Co., 50 F.3d 137, 140 (2d Cir. 1995).

Great Lakes argues that insurance contracts, just like other contracts, must be read as a whole, giving meaning to each clause and provision. The insurance policy at issue here includes a seaworthiness warranty provision, the definition of seaworthiness, and the definition of a scheduled vessel, detailed above. Ultimately, Great Lakes argues that the district court failed to follow New York law when it did not interpret these provisions to have required Andersson to carry the charts in question. Narrowly interpreting the policy, as required under New York law, and considering the language used by Great Lakes leaves its argument baseless.

Although Great Lakes primarily objects to the district court's failure to rely on the policy's language, it concedes that the district court did quote part of the policy's definition of seaworthiness. Great Lakes nonetheless contends that the district court "neutered" the policy's express definition of seaworthy when it did not include up-to-date paper charts in its interpretation of the language "parts, equipment and gear." However, this is not so. The district court simply found that Great Lakes' interpretation was not supported by the express terms of the policy, precedent, or common sense. To construe the express

warranty in such a way would be to require a vessel to have and maintain updated paper charts for every location in the area where it could navigate at all times from the time the policy commences which, as we stated above, is completely unreasonable and unsupported by admiralty caselaw. Further, interpreting the policy in this manner would render the policy void from its inception whether the vessel ran aground or not. In addition, the district court compared this case to that of Acadia Ins. Co. v. Hansen, which had a similar express warranty of seaworthiness. See 2022 U.S. Dist. LEXIS 75760 (E.D.N.Y. 2022). The court determined there that "the applicable measure for a breach of express warranty of seaworthiness is whether the vessel was fit for its voyage intended when it embarked." Id. at *91. The district court used this holding to clarify that an express warranty of seaworthiness concerns whether the vessel was equipped for its specific intended course, not for every location that could be navigated under the entirety of the policy coverage area at its inception, rendering Great Lakes' argument meritless.

Great Lakes argues that the district court should have taken a closer look at the policy's language. But doing so only confirms that the district court reached the correct outcome. First, nowhere in the express terms of the policy are charts required or mentioned, nor do they qualify under the definition of a "Scheduled Vessel." Narrowly construing the policy's definition

- 16 -

of "Scheduled Vessel," charts cannot be recognized as an included element.  Charts are not "machinery, electrical equipment, sails, masts, spars, or rigging."[10]  And although charts are arguably "equipment normally required for the operations and maintenance of the vessel," they are not "normally . . . sold with the vessel," and therefore do not qualify as part of the "Scheduled Vessel."  In the definition of seaworthiness, it is not clearly stated that

---

[10] Machinery is defined as "machines in general or as a functioning unit," "the working parts of a machine," or "the means or system by which something is kept in action or a desired result is obtained."  Electrical is "of, relating to, or operated by electricity" which by its terms excludes paper charts when in reference to equipment.  Sails are "an extent of fabric (such as canvas) by means of which wind is used to propel a ship through water" or "the sails of a ship."  A mast is "a long pole or spar rising from the keel or deck of a ship and supporting the yards, booms, and rigging" or "a slender vertical or nearly vertical structure (such as an upright post in various cranes)."  A spar is "a stout pole" or "a stout rounded usually wood or metal piece (such as a mast, boom, gaff, or yard) used to support rigging."  Rigging is "lines and chains used aboard a ship especially in working sail and supporting masts and spars."  Machinery, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/machinery (last visited Dec. 21, 2023); Electrical, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/electrical (last visited Dec. 21, 2023); Sail, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/sail (last visited Dec. 21, 2023); Mast, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/mast (last visited Dec. 21, 2023); Spar, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/spar (last visited on Dec. 21, 2023); Rigging, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/rigging (last visited Dec. 21, 2023); cf. Merriam-Webster's Collegiate Dictionary, (11th ed. 2020); Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (providing the same definitions for each term with the omission of "such" in the parentheticals).

charts are considered "parts, equipment or gear" and Great Lakes has provided no caselaw, as discussed above, to support that interpretation. Insurance contracts are to be construed against the insurer, further weakening Great Lakes' argument that "charts" should be read into the policy. See Ingersoll Milling Mach. Co., 829 F.2d at 306-07 (construing the meaning of provisions seeking to narrow insurer's liability in favor of the insured).

Second, at no point do the express terms of the policy warranty require a higher standard at any particular time, most notably not at the inception of the agreement. The warranty provision of seaworthiness only requires that the 1) "[s]cheduled [v]essel" 2) must be "seaworthy" 3) "at all times" 4) "during the duration of [the] insuring agreement." The only mention of the inception of the policy is in the warranty where it notes that the policy would be void from its inception if the vessel was not seaworthy "at all times." What the policy does not do is require that the vessel itself must be seaworthy in the specific sense that it maintain updated charts for every location that could be navigated under the entirety of the policy coverage area, from the inception of the policy. Therefore, the argument that updated paper charts are required on board at the inception of the policy for every area covered by the policy is unsupported by the express language of the policy.

Third, even if it were to be determined that updated paper charts were included in "parts, equipment and gear," there is a difference in language used in the definition of seaworthiness between the vessel's intended "purpose" and intended "use." As the definition states, "[f]or the Scheduled Vessel to be seaworthy, it . . . must be reasonably proper and suitable for its intended use." Intended "use" is not defined or limited in the policy language. The intended "use" of the vessel could change daily depending on the journey embarked upon or the activities pursued, requiring different "parts, equipment and gear" for each "use." In addition, the two different phrases within the provision, "intended use" and "intended purpose," are to be given their own full effect and meaning, per New York law. See LaSalle Bank Nat'l Ass'n, 424 F.3d at 206; Theater Guild Prods., Inc. v. Ins. Corp. of Ir., 267 N.Y.S.2d 297, 300-01 (N.Y. App. Div. 1966).

In addition to its main argument that the policy language was not applied, Great Lakes also argues that affirmation of the district court order would render a vessel unseaworthy in a tort liability sense due to a lack of updated charts, but seaworthy in an insurance dispute even with the lack of updated charts. This argument fails. We see nothing to suggest that a vessel would be liable in tort for failing to carry paper charts for routes it never intended to sail.

Great Lakes lastly attempts to argue that the district court order gave no reasonable basis for asserting that Great Lakes could not expressly enforce the definition of seaworthiness provided in Labarca, which Great Lakes claims to have mirrored in its own policy. Rather, Labarca stands for the proposition that we have outlined above: that a vessel's seaworthiness depends upon whether it is "reasonably fit for [its] intended use[,]" which itself turns upon the circumstances. Labarca, 260 F.3d at 7 (quoting Trawler Racer, Inc., 362 U.S. at 550). We have never held, nor do we now, that this finding turns upon one irrelevant facet of a vessel's voyage that bears no connection to whether it is reasonably fit for its intended use. The notion that Great Lakes was relying on Labarca, which therefore means charts for every location that could be navigated under the entirety of the policy coverage area are included in the determination of seaworthiness at a policy's inception, is unsupported and fails as this is not what Labarca held.

When we narrowly construe the policy, read it as a whole, and give meaning to each of its words and provisions, we conclude it cannot reasonably be read to require updated paper charts for every location that could be navigated under the entirety of the policy coverage area to be on board at the inception of the policy. In addition, there is no precedent supporting the claim that updated paper charts for every location that could be navigated

under the entirety of the policy coverage area are required to have been on board the vessel at the inception of the policy. Therefore, Great Lakes' arguments fail and the district court's order in favor of Andersson for partial summary judgment was warranted.

### III. Conclusion

The district court's order finding Andersson to be covered by the policy is

**<u>Affirmed</u>**.